**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**DENA GREEN HARRIS,**

       **Plaintiff,**

**vs.**                               **Case No.  4:08cv280-SPM/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

_____/


**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the

decision of the Commissioner be reversed and the case be remanded.

**Procedural status of the case**

Plaintiff, Dena Green Harris, applied for supplemental security income benefits.

Plaintiff was 45 years old at the time of the administrative hearing (on November 8,

2007), has a 11th grade education and training as a certified nursing assistant, and has

past relevant work as a certified nursing assistant and a retail store clerk.  R. 269-272.

Plaintiff alleges disability due to neck and back pain, chronic pain from fibromyalgia, and depression.

The Administrative Law Judge found at step 2 that Plaintiff has the severe impairments of herniated discs at C4-5 and C5-6, an annular tear at L4-5, and general arthralgias, but does not have any sort of severe mental impairment.  R. 19-20.  He found that Plaintiff is capable of appropriate interaction in a work setting, and can do a substantial range of sedentary work, that is, she can lift and carry 10 pounds occasionally, and less than that frequently; sit for up to 6 hours a day and stand or walk for 2 hours per day, "with normal breaks and with a sit/stand option to permit her to shift position, as needed;" climb stairs and ramps;  frequently balance and occasionally stoop, kneel, crouch, or crawl; but must avoid unprotected heights and moving machinery.  R. 20.   Considering Plaintiff's limitations, the ALJ found at step 4 that she no longer could do her past relevant work, and at step 5 that the "grids"[1] should not be used.  R. 23.  He determined, however, based upon testimony from a vocational expert, that there were several jobs that Plaintiff could perform within her limitations, and therefore, was not disabled as defined by Social Security law.  R. 23-24.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at:
http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

       The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[2]

Plaintiff testified that she suffered from costochondritis[3] and was terminated from work at Family Dollar Store for that reason.  R. 270.  She said that she experiences constant back pain down to the coccyx, asserting that it was "very painful, very excruciating."  R. 272.  She rated the pain 8 on a scale of 10.  R. 273.  She said that the pain depends upon the weather, and whether she was lying still, and described it as an aggravating, gnawing pain.  R. 273.  She said she follows the instructions of her treating physician, Dr. Ortolani, doing small stretches and bends, and lying on the bed with pillows under her knees, and she does this two or three times a day for 30 minutes or more.  *Id.*  At this point in the hearing, Plaintiff asked for permission to stand, and as she moved, the transcript reflects that she said: "Oh, Lord Jesus."  R. 274.

_____

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

[3] Costochondritis is an inflammation of a rib or the cartilage connecting a rib. This is a common cause of chest pain. Inflammation or injury involving the chest muscles is another common cause of chest pain.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

Case No. 4:08cv280-SPM/WCS

Plaintiff testified that she had constant pain in both legs radiating from the back to her ankles.  R. 274.  She said the pain had definitely gotten worse since May of 2006.  *Id.*  She said that on a normal day, her pain was about 5.5 on a scale of 10.  R. 275.  At night, she said, it was excruciating, 7 or 8.  *Id.*

Plaintiff said that she also has herniated, protruding, bulging discs in her neck.  R. 275.  She said that this was caused by the car accident in 2005.  *Id.*  Plaintiff said she had to sleep, walk around her house, and drive in a cervical collar.  R. 276.  She said that she suffered excruciating headaches from her neck injury.  R. 277.  She said that she had pain radiating from her neck into her arms and hands, and the pain causes her to be unable to grip small objects.  R. 279.  She said it had taken her 48 minutes to cut up a chicken for cooking.  *Id.*

Plaintiff said she could sit for about 20 minutes without needing to move, and she uses pillows to sit.  R. 280.  She said that if she stood for more than 10 minutes, she had to bend her back.  *Id.*  She said that she loses her balance when she stands.  *Id.*  She uses a cane for balance.  *Id.*  She said she could not walk 100 yards.  R. 281.  She said she could climb stairs, but would have to rest after four or five steps.  *Id.*  A gallon of milk was the heaviest object that she could lift, but she could not bend over to pick up a gallon of milk.  *Id.*  She said she could not even make a motel bed because she cannot lean over.  R. 286.

Case No. 4:08cv280-SPM/WCS

Plaintiff said she slept with 11 pillows, and had to turn every 35 to 45 minutes.  R. 282.  She sleeps in her cervical collar.  *Id.*

Plaintiff said that she became drowsy from her medication.  R. 282.  Again, the transcript reflects that she interjected "Oh Jesus."  *Id.*  She took Lortab[4] 7.5, Robaxin,[5] Mobic,[6] and Soma.[7]  *Id.*

Plaintiff said that when she awakes in the morning, she sometimes has to take pain medication and has to sit quietly due to pain.  R. 283.  She then cooks breakfast for herself.  *Id.*  She sits in a recliner.  *Id.*  She does not clean around the house due to pain.  *Id.*  She accompanies her son for food shopping, and sometimes she drives a motor vehicle.  *Id.*  She uses a grocery cart for support or uses the motorized cart.  R. 284.

---

[4] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Lortab is used to treat severe pain.  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

[5] Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] Mobic is a nonsteroidal anti-inflammatory drug (NSAID) in prescription form. It is used to relieve the pain and stiffness of osteoarthritis and rheumatoid arthritis. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[7] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that her family practice physician wanted to prescribe Seroquel[8] for a bipolar disorder.  R. 284.

The ALJ then called a vocational expert.  R. 287.  He asked the expert to assume an individual who is "limited to between sedentary and light work with a 15-pound lifting restriction and requiring a sit/stand option . . . and unskilled or semi-skilled, low end of semi-skilled work . . . ."  R. 287-288.  The expert said that such a person could do work as a cashier, general office work, surveillance system monitor, sedentary packer, and gate guard.  R. 288.

**Medical Evidence**

On May 13, 2005, Plaintiff was involved in an automobile accident, injuring her head, neck, and lower back.  R. 209.  She was seen by John A. Ortolani, M.D., on June 2, 2005.  R. 209-211.  She told Dr. Ortolani that she was having neck pain with pain radiating into both hands.  R. 209.  She also told Dr. Ortolani that she had been in automobile accidents in 1987, 1989, and 1993, and that she had a shoulder injury from a fall in 1998.  *Id.*  She complained about "some chronic problems with her neck and low back since," but Dr. Ortolani noted that "the scans of her neck and low back [prior to this date] have always been normal."  *Id.*  She said she had had "problems with memory, thinking, and concentration before another had injury back in the 1993 accident, but that has mostly resolved."  *Id.*  An EMG study had shown carpal tunnel syndrome, but she "was released and she has done well since then."  *Id.*

---

[8] Seroquel is prescribed for the treatment of schizophrenia, a mental disorder marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of contact with reality.  It is also used for the treatment of manic and depressive episodes associated with bipolar disorder.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On examination, Dr. Ortolani found:

> paracervical and paralumbar muscle tenderness and spasms of moderate severity.  She can barely turn her neck from side to side and she cannot extend the back at all.  Straight leg raising bilaterally produces pain in both legs.

R. 209.  He found that Plaintiff's motor strength was equal in all extremities, with no atrophy or fasciculations.[9]  R. 211.  Dr. Ortolani's diagnosis was posttraumatic headaches, probable concussion, cervical strain syndrome with radicular symptoms into both hands, and lumbosacral strain syndrome with radicular symptoms into both legs and knees.  R. 211.  He ordered a head scan, an EEG, and MRI scans of the cervical and lumbar spine.  *Id.*  He started Plaintiff on Lortab 7.5 mg three times a day and Flexeril[10] 10mg three times a day.  *Id.*  He also ordered physical therapy.  *Id.*

An MRI of the lumbosacral spine was taken on June 16, 2005.  R. 206.  From this, Dr. Ortolani found:

> There is a posterior disc protrusion seen at the L4-5 level.  It extends posteriorly and comes in contact with the thecal sac and is lateral to the left side, narrowing the intervertebral foramen slightly.  This is consistent with an annular tear in this area.  Otherwise the disc spaces appear to be preserved.

*Id.*  He said that "[w]hen compared to previous MRI scans dated 5/12/1994 and 7/9/1997, this would appear to be a new finding."  *Id.*  Reading the MRI of the cervical spine dated June 16, 2005, Dr. Ortolani wrote: "Herniated discs seen at C4-5 and C5-6,

---

[9] A fasciculation is the a minor local contraction (twitch) of a muscle.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

[10] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls.  Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

mostly midline and to the left side, with some interference with the intervetebral foramen." R. 207.  He said that at the C4-5 and C5-6 levels, the hernias were small.  *Id.* Comparing this MRI with MRI scans on August 12, 1998 and November 12, 1993, which had been normal, Dr. Ortolani determined that "these two herniated discs would have to be considered new." *Id.*  Dr. Ortolani concluded that Plaintiff did receive injuries from the motor vehicle accident on May 13, 2005.  R. 204.

On July 26, 2005, Plaintiff reported to Dr. Ortolani that she was still having "a moderate amount of pain and discomfort."  R. 203.  He gave Plaintiff an injection of Lidocaine into the cervical region.  *Id.*  Plaintiff sought emergency medical treatment for shoulder, upper back, and neck pain on August 24, 2005.  R. 134.  On August 29, 2005, Dr. Ortolani noted that Plaintiff was "doing poorly."  R. 202.  On September 23, 2005, Plaintiff again sought emergency medical treatment for pain in her lower and upper back and neck.  R. 131.  On October 31, 2005, Dr. Ortolani found that Plaintiff was still having "a lot of neck and back problems related to her auto accident."  R. 201.  She had "headaches, the neck pain and even the low back pain."  *Id.*  Dr. Ortolani rated a 7% impairment of the neck and 4% impairment of the lower back, for an 11% whole body impairment from the accident on May 13, 2005.  *Id.*

On November 23, 2005, Dr. Ortolani wrote in a memorandum that Plaintiff had "significant problems with her neck and back related to multiple injuries occurring in 1993, 1998, 2003, and 2005."  R. 200.  He said:

> Because of these injuries, she has limited use of her upper and lower extremities.  She also has problems sitting for prolonged periods of time. The patient requires a job that is both sedentary and standing, where she can walk around as may be needed.  She is limited to lifting no more than 15 pounds.  She should not be sitting for prolonged periods of time, such

as greater than 20-30 minutes, without the ability to get up and stretch.
Due to her limitations in sitting for prolonged periods, this patient is unable
to travel any distance.

*Id.*

On January 31, 2006, Dr. Ortolani again saw Plaintiff.  R. 199.  He found that she

was "doing about the same at this time.  She still has spasms in the cervical and lumbar

spine and she still requires the Lortab, Norflex, and Xanax."[11]  *Id.*

On May 10, 2006, Plaintiff was examined on a consultative basis by Kirk J.

Mauro, M.D.  R. 140.  Dr. Mauro reported that Plaintiff had "a history of fibromyalgia."

R. 140.  Dr. Mauro related the MRI findings and Dr. Ortolani's treating history.  *Id.*

Plaintiff reported to him that she had "pain everywhere, as well as persistent

headaches."  *Id.*  She said she had tingling in both hands and in the back of both lower

extremities.  *Id.*  She said that she was precluded from working by "intermittent

costochondritis."  *Id.*

Plaintiff reported to Dr. Mauro that she was "independent with her own activities

of daily living, but reports she does require extra time [to accomplish these].  She can tie

shoes, button buttons and zip zippers.  She is independent with higher level financial

management type skills.  She reports she can occasionally cook."  R. 140-141.  She

would not do dishes, and said she could walk 125 feet.  R. 141.  She used a cane in

either her right or left hand.  *Id.*  She said she could sit for 10 to 20 minutes.  *Id.*

On examination, Dr. Mauro found that Plaintiff's manual muscle strength was 5/5

(normal and undiminished) "although the patient reported diffuse pain with all resistance

---

[11] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the
treatment of anxiety disorders.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

testing." R. 141. Plaintiff had full finger dexterity. *Id.* Plaintiff reported "significant pain

with straight leg raise testing at 20 degrees bilaterally." *Id.* Her neck and back were

tender to palpation, but Dr. Mauro could not detect any paraspinal spasm. *Id.* Her "gait

was stable, with forward, backward and tandem walk, without the use of an assistive

device." *Id.* Dr. Mauro noted decreased range of motion in the cervical spine, with a

report of significant discomfort with range of motion testing in all joints. *Id.*

Dr. Mauro's "impression" was "[m]usculoligamentuous abnormality of the

paracervical and paralumbar spine, with documented disc herniation" and fibromyalgia.

R. 142. Dr. Mauro concluded:

> Overall, the patient is pleasant and interactive. She is literate. She can sit
> brief periods of time and is ambulatory. It is likely she could be
> employable from a sedentary to light duty perspective.

*Id.*

On June 2, 2006, Plaintiff had a consultative mental status examination by Paul

S. Deitchman, Ph.D. R. 144. Plaintiff told Dr. Deitchman that she had been diagnosed

with fibromyalgia in 2000. *Id.* She reported to him that she used "warm baths, a

cervical collar, a cane, and heat moisture pads as needed." *Id.* Plaintiff reported to Dr.

Deitchman that in the prior year, she had experienced depression, with sadness,

increased irritability, and social withdrawal. R. 145. She take Xanax to help with

tension and to assist in sleep. *Id.* She had had no history of mental health related

treatment and said she was generally stable and upbeat. *Id.* She said she spends

most of her time at home, reclining and watching television. *Id.* She spends most of

her time relaxing. *Id.* She said that she goes out for limited periods of time with her

husband or sister to attend church, go shopping, or pay a bill, bathes every day, and can change her clothes.  *Id.*  Her husband and sister do the cleaning and cooking.  *Id.*

Dr. Deitchman said that Plaintiff walked with a cane, and during the interview, "displayed notable pain related behaviors including lying down, shifting positions in her chair, getting up at points to move about, and closing her eyes in pain."  R. 146.  She focused on her pain "as her most prominent difficulty in life."  *Id.*  "Her mood reflected mild to moderate depression."  *Id.*  Dr. Deitchman also said that Plaintiff was responsive, pleasant, coherent, relevant, of average intelligence, had good recall of her personal history, and had good ability to relate.  *Id.*  Dr. Deitchman's diagnostic impression was "Probable "Adjustment Disorder with Depressed Mood."  *Id.*

On June 5, 2006, a non-examining state agency physician (who reviewed the medical records) expressed the opinion that Plaintiff was capable of performing light work with some limitations (no ladders or scaffolds, limited ability to reach).  R. 148-150. A few days later, a non-examining state agency psychologist determined from her review of the records that Plaintiff had an "affective disorder" that was not severe.  R. 155.  She noted that Plaintiff had adjustment disorder rule out situational depression.  R. 158.  She thought that Plaintiff had only mild limitations of functions.  R. 165.  The psychologist based her opinion upon the examination by Dr. Deitchman, reciting his findings.  R. 167.

On July 20, 2006, Dr. Ortolani said that Plaintiff's condition was "about the same."  R. 198.  He said:

> She has two herniated discs in her neck and an annular tear in her low
> back, and she is really disabled between this and her right shoulder injury

and carpal tunnel syndrome.  I do not feel she is really capable of gainful
employment.

R. 198.  He continued her medications.  *Id.*

On September 19, 2006, Dr. Ortolani said that Plaintiff's condition was "about the
same."  R. 197.  He noted that she had brought in a form for him to fill out.  Dr. Ortolani
again said:

I feel this patient is unable to be gainfully employed.  She has two
herniated discs in her neck, an annular tear in her low back, a shoulder
injury, and carpal tunnel syndrome.

*Id.*  On the same day, Dr. Ortolani completed a "Residual Functional Capacity
Questionnaire."  R. 245-246.  He said that in a normal work day, Plaintiff cannot stand,
walk, or sit for any length of time, or lift any weight.  R. 245.  He said that Plaintiff cannot
use her hands for repetitive pushing, pulling, or fine manipulation, and cannot reach
above her shoulder level.  *Id.*  He said that Plaintiff cannot use her feet for repetitive
movements as in operating foot controls.  *Id.*  He said that Plaintiff had no ability to
bend, squat, crawl, or climb.  *Id.*  He expressed the opinion that Plaintiff cannot sustain
activity at a pace and with attention to task as would be required in a competitive
workplace.  *Id.*  He thought that Plaintiff needed a hand-held assistive device for even
occasional walking or standing.  R. 246.  He thought that Plaintiff could not be expected
to attend any employment for 8 hours a day, 5 days a week.  *Id.*  As the reason for
these opinions, Dr. Ortolani said that "Pt is in pain.  Can not bend, stand, or sit for any
period of time."  *Id.*

On December 28, 2006, Plaintiff went to the emergency room for pain because she was out of her pain medication.  R. 238.  She had an appointment the next day for "pain management."  *Id.*

On January 2, 2007, Dr. Ortolani saw Plaintiff, noting that she was "still having a moderate mount of pain.  She was in severe pain a couple of days ago, where she ended up having to go to the Emergency Department.  At this time she is better from that, and it is not exactly clear what triggered that."  *Id.*  He noted: "On examination today, she has reasonable movement of her neck and back at this time."  *Id.*

On March 5, 2007, Plaintiff went again to the emergency room complaining of "dental pain, back pain" for a couple of weeks.  R. 231.  Her chief complaints were neck pain spasms, infected gums, and teeth pain.  R. 236-237.

On April 2, 2007, Plaintiff was seen by Dr. Ortolani complaining of "a lot of upper cervical pain."  R. 195.  Dr. Ortolani found her pain to be "moderately severe."  *Id.*  He determined that she needed "some therapy in the upper occipital region" and he ordered this.  *Id.*  He renewed the prescriptions for Lortab and Robaxin because "this combination is working for her."  *Id.*

On May 22, 2007, Plaintiff returned to the emergency room.  R. 224.  She reported an exacerbation of chronic neck and back pain.  R. 225.  She said that she "overdid it cleaning & cooking."  R. 227.  She was out of Lortab 7.5mg, and said that only Percocet[12] worked when the pain was that bad.  R. 225.  She said she was unable

---

[12] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain. It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

to see her pain physician until June 5, 2007.  *Id.*  Percocet and Valium[13] were

prescribed.  R. 226.

On August 9, 2007, Plaintiff was seen by Kelley Lang, M.D.  R. 253.  Dr. Lang's

report is lengthy.  Plaintiff complained of severe insomnia, and had just stopped taking

Xanax.  R. 255.  She had been taking Prozac, Zoloft,[14] and Paxil,[15] but those drugs did

not help sleep.  *Id.*  Zoloft had made her feel aggressive.  *Id.*  She denied having "true

depression," but Dr. Lang found symptoms of depression, including insomnia, no joy in

life, a feeling of nothing to look forward to, agitation, and short temper.  *Id.*  Plaintiff said

that she "hurts all over all the time."  *Id.*  Dr. Lang examined Plaintiff, finding that she

appeared to be in pain, "is moving around continuously; does not want to sit still and

complaining of her back, shoulders, arms, and legs generally aching although this is not

new."  R. 254.  She had full range of motion in her neck.  *Id.*  Dr. Lang found that

Plaintiff was "[t]ender all over, tender to touch and tensing of the shoulders, arms,

thighs, and lower back."  *Id.*  Her strength appeared to be normal.  *Id.*  Dr. Lang thought

that Plaintiff's insomnia was "probably part of a bigger picture of either an anxiety or

depressive disorder, but I truly think that this patient may even have a bipolar disorder.

It has been going on for a longtime.  It [is] made worse now with her chronic pain."  R.

_____

[13] Valium is used in the treatment of anxiety disorders and for short-term relief of the
symptoms of anxiety. It belongs to a class of drugs known as benzodiazepines.
PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[14] Zoloft is prescribed for major depression – a persistently low mood that interferes
with everyday living.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[15] Paxil relieves a variety of emotional problems. It can be prescribed for serious,
continuing depression that interferes with your ability to function.  PDRhealth™,
PHYSICIANS DESKTOP REFERENCE

253. She said that Plaintiff's depressive illness and chronic pain were intermeshed. *Id.*
She said again that she thought that Plaintiff probably had bipolar disorder. *Id.* She
decided that Xanax was too addictive and causing problems, and planned to switch
Plaintiff to Seroquel.[16] *Id.* She warned Plaintiff that Seroquel is very sedating and "may
even make her groggy in the daytime," but if she persisted, this would improve. *Id.* Dr.
Lang said:

> This patient obviously has a lot of issues, see above, and plus her
> accident. She is now disabled as a result of these car accidents and due
> to the chronic pain. She has been labeled as a patient with fibromyalgia.
> Actually I think she probably more likely has chronic pain syndrome.

*Id.*

On September 6, 2007, Plaintiff again saw Dr. Lang. R. 252. Dr. Lang said that
the "best we can hope for is to dampen down the pain, so that it becomes bearable or to
have [it] not noticeable anymore, so our main aim here is to get her pain under control
and her sleeping under control." R. 251. Dr. Lang said that Plaintiff suffered from
"anxiety and depression versus bipolar," decided to postpone Seroquel until Plaintiff
returned from caring for her mother, contemplated using Cymbalta,[17] "which has been
showing to help fibromyalgic pain a little better," and thought that Plaintiff suffered from
"fibromyalgic pain" increased due to stress. R. 251.

---

[16] Seroquel is prescribed for the treatment of schizophrenia, a mental disorder
marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of
contact with reality. It is also used for the treatment of manic and depressive episodes
associated with bipolar disorder. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[17] Cymbalta is used to treat major depression. PDRhealth™, PHYSICIANS DESKTOP
REFERENCE.

On September 10, 2007, Dr. Ortolani again found Plaintiff to be "doing about the same at this time," still "having a moderate amount of pain."  R. 249.  He explained exercises for her back and neck, and showed her how to sit with a pillow.  *Id.*  He continued her pain medications.  *Id.*

**Legal Analysis**

> **Whether the ALJ correctly advised the vocational expert as to Plaintiff's residual functional capacity limitations**

Plaintiff contends that the ALJ posed an incorrect hypothetical to the vocational expert because his ultimate residual functional capacity determination for Plaintiff was more restrictive.  Plaintiff argues three errors, (1) with respect to a sit or stand option, (2) Plaintiff's lifting ability, and (3) the skill requirements of the jobs identified.  Doc. 16, p. 11.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (citation omitted).

The ALJ determined that Plaintiff had the residual functional capacity:

> to perform a substantial range of sedentary work:  she can occasionally lift/carry 10 pounds, less than 10 pounds, frequently; she can sit for up to 6 hours and to [sic] stand/ walk for up to 2 hours in an 8-hour work day, with normal breaks and with a sit/stand option to permit her to shift position, as needed. . . .

R. 20.  He cited SSR 96-9p.  *Id.*  At the hearing, however, the ALJ asked the expert to assume an individual who is "limited to between sedentary and light work with a 15-

pound lifting restriction and requiring a sit/stand option . . . and unskilled or semi-skilled, low end of semi-skilled work . . . ."  R. 287-288.

### Sit or stand option

Social Security Ruling 96-9p provides:

**Alternate sitting and standing**:  An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically.  *Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded.*  The extent of the erosion will depend on the facts in the case record, *such as the frequency* of the need to alternate sitting and standing and the length of time needed to stand. *The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.*  It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

Social Security Ruling 96-9p (emphasis added).

Plaintiff points out that although the ALJ's residual functional capacity (RFC) assessment included the frequency of sitting or standing ("as needed"),[18] the hypothetical to the vocational expert did not.  That is true.  In the hypothetical to the vocational expert, he noted the need for a sit/stand option but failed to follow SSR 96-9p, setting forth the *frequency* of the need to exercise this option.  R. 287-288.  Plaintiff argues that the ALJ's subsequent finding, that Plaintiff could perform the jobs of surveillance monitor and cashier within her residual functional capacity, that is, with the option of sitting or standing as needed or at will is not supported by substantial evidence in the record.  Doc. 16, p. 12.

---

[18] Actually, it did not.  This does not satisfy SSR 96-9p because it is unknown how often Plaintiff would "need" to exercise the option, to sit and then to stand.  It is one thing to do so after a few hours, and quite another to "need" to do so every minute.

Plaintiff's argument is persuasive.  It is unknown on this record how often Plaintiff would "need" to sit or to stand, and whether with that "need," the jobs of surveillance monitor and cashier could be performed by Plaintiff.  A remand is needed to determine the frequency of Plaintiff's need to alternate between standing and sitting in work, and then to include that frequency in the hypothetical to the vocational expert.

### Weight carrying limitations

Plaintiff also argues that the ALJ's determined RFC did not match the hypothetical to the vocational expert with regard to ability to carry weight.  This assertion is also true.  The hypothetical to the expert assumed what the ALJ termed a "15-pound lifting restriction," while his RFC determined that Plaintiff "she can occasionally lift/carry 10 pounds, less than 10 pounds, frequently."  Plaintiff contends that as a consequence, the ALJ's determination that she can do the job of cashier is not supported by substantial evidence in the record.  This is so because the vocational expert did not state whether the cashier job requires an ability to do light work, an ability beyond Plaintiff's sedentary RFC.  Doc. 16, pp. 12-13.

Defendant notes that the job of cashier is identified by the Dictionary of Occupational Titles (DOT) as both a light and a sedentary job.  Doc. 19, p. 13. Defendant argues that even if Plaintiff is unable to perform cashier work requiring an ability to do light work, she still could do the job of surveillance system monitor, a sedentary job.  *Id.*  That is true, but the problem is that this record does not contain evidence as to how often Plaintiff would "need" to sit or to stand, and whether with that "need," the jobs of surveillance monitor and cashier could be performed by Plaintiff. Moreover, while there are probably a large number of cashier jobs in the national

economy that are sedentary, the record does not contain substantial evidence to draw

that conclusion.  Plaintiff's argument on this point is persuasive.  A remand is needed to

clarify how many sedentary cashier jobs are in the national economy, assuming that

Plaintiff's ability to do this job remains relevant to the Commissioner.

**The lack of evidence of transferrable skills to do semi-skilled jobs**

The ALJ found that the issue of the transferability of work skills was not material

because a finding of not disabled was indicated by reference to the Medical-Vocational

Rules, which provide that for a person of Plaintiff's age, education, and RFC, the

transferability of job skills was not relevant.  R. 23.  This finding, however, itself was

immaterial to the decision because the ALJ determined that Plaintiff's ability to do a full

range of light work was "impeded by additional limitations."[19]  *Id.*  Relying instead upon

vocational evidence, the ALJ determined that Plaintiff can do the work of cashier, a

*skilled* job of SVP of 5.[20]  *Id.*  The vocational expert did not testify as to the skill levels of

any of the jobs identified, and did not testify as to the transferability of Plaintiff's skills.

R. 287-288.  Plaintiff has past relevant work as a certified nursing assistant and a retail

store clerk.  R. 269-272.  The transferability of skills learned in those jobs to the skilled

job of cashier is unknown.  Defendant's argument that the surveillance system monitor

---

[19] "If the ALJ concludes that Phillips cannot perform a full range or unlimited types of work at the sedentary level given her exertional limitations, then the ALJ must consult a vocational expert to determine whether there are sufficient jobs at the sedentary work level within the national economy that Phillips can perform."  Phillips v. Barnhart, *supra*, 357 F.3d at 1142.

[20] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available at 2000 WL 1898704.

job is an unskilled job with an SVP of 2 is correct, doc. 19, p. 14 n. 2, but substantial

evidence does not exist in the record to conclude that Plaintiff can perform *that* job due

to the problems discussed above with the sit or stand option.  A remand is needed to

clarify this issue of transferrable skills if the cashier job remains relevant.

### Compliance with SSR 00-4p

Plaintiff argues that Social Security Ruling 00-4p provides that the ALJ "has an

affirmative duty to ask about any possible conflict between that VE [vocational expert] or

VS evidence and information provided in the DOT."  The ALJ did not ask the vocational

expert specifically whether his testimony conflicted in any way with the DOT, R. 287-

288, yet the ALJ determined that the vocational expert's testimony was "consistent with

the information contained in the Dictionary of Occupational Titles."  R. 24.

Defendant acknowledges that this occurred, but contends that the failure was

harmless because Plaintiff has not identified any conflicts.  Doc. 19, p. 15.  Plaintiff

argues that the DOT does not contain any information about whether a person can

perform a specific job with a sit or stand option.  Doc. 16, p. 14.  In Parker v. Astrue,

2008 WL 434670 (N.D. Fla. Sep 18, 2008) (No. 3:07cv450-MCR/MD), the court

determined that a failure to ask the vocational expert about possible conflicts between

his testimony and the DOT was harmless where "the vocational expert specifically took

into account plaintiff's need to alternate positions when assessing which jobs she could

perform."  *Id.*, at *10.  The reasoning of Parker v. Astrue would be persuasive if it were

not for the fact that the vocational expert here was not asked to consider the frequency

that Plaintiff must employ a sit or stand option.  Thus, in this case, it cannot be said that

the error was harmless or that the vocational expert "specifically" took into account

Plaintiff's specific need.  A remand is needed to clarify this, along with the other issues identified above.

### Dr. Ortolani's opinion as a treating physician and the credibility of Plaintiff's testimony as to the degree of pain she experiences

These are related claims, and will be discussed together.  Plaintiff contends that the ALJ erred in his rejection of the opinion of the treating neurologist, Dr. Ortolani, as to her ability to do work.  Doc. 16, p. 15.  She also contends that the ALJ erred in rejecting Plaintiff's testimony concerning pain.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .  Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be

> expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d
> 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he
> must articulate explicit and adequate reasons for doing so. *See Hale v.
> Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the
> reasons for discrediting subjective testimony requires, as a matter of law,
> that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).

The ALJ noted Dr. Ortolani's "Residual Functional Capacity Questionnaire." R.

19. He rejected "Dr. Ortolani's RFC opinion as being inconsistent with his own record,

with other reports of record, with the claimant's attendance and demeanor at the hearing

and with common sense." R. 19. The ALJ concluded that Dr. Ortolani's RFC opinion,

that Plaintiff cannot stand, walk, sit or lift during a normal 8 hour work day, was

"nonsensical." He reasoned: "If the claimant were to remain at home she would have

to sit, stand, walk and lift to some degree. She attended and sat through the hearing.

Further, he had previously indicated that she had only an 11% whole body impairment."

*Id.*

With respect to Plaintiff's testimony, the ALJ found that although Plaintiff's

medically determinable impairments could reasonably be expected to produce the

alleged symptoms,[21] her testimony was not entirely credible. R. 22. The ALJ gave

great weight to the reports and findings of Dr. Ortolani, except for his RFC finding. *Id.*

---

[21] This would seem to *satisfy* both prongs (1) and (2)(a) of the pain standard,
"evidence of an underlying medical condition" and "the objectively determined medical
condition can reasonably be expected to give rise to the claimed pain."

He also gave great weight to the opinions and findings of Dr. Mauro and Dr. Deitchman. *Id*. He also relied upon the opinions of the state agency non-examining sources. *Id*. The ALJ pointed out that on June 2, 2005, Dr. Ortolani reviewed Plaintiff's prior treatment record and found that scans of her neck and back were normal prior to May, 2005, despite the fact that Plaintiff had had a series of accidents, and he determined that any residual problems from those earlier accidents "appeared to have resolved." *Id*. He concluded that "prior to her May 13, 2005[,] accident, the claimant was in relatively good health." *Id*. He noted that after that last accident, Plaintiff did suffer two herniated discs at C4-5 and C5-6 and an annular tear at L4-5. *Id*. He observed that the medical record noted a history of fibromyalgia, but "there is no evidence of examination, of symptoms or a description of any existing trigger points." *Id*. He concluded that "the diagnosis of fibromyalgia is not supported by acceptable medical evidence." *Id*.

The ALJ's decision to discount the RFC provided by Dr. Ortolani is supported by substantial evidence in the record. On November 23, 2005, Dr. Ortolani said that Plaintiff:

> requires a job that is both sedentary and standing, where she can walk around as may be needed. She is limited to lifting no more than 15 pounds. She should not be sitting for prolonged periods of time, such as greater than 20-30 minutes, without the ability to get up and stretch.

R. 200. This is an opinion that Plaintiff was capable then of doing sedentary work with the option to stand frequently. A year later, Dr. Ortolani decided that Plaintiff could not do sedentary work, yet in the intervening year, he made not significant findings concerning her residual functional capacity. Dr. Ortolani did not see Plaintiff many times during that year, and he seems only to have continued to provide pain medication to

her.  He made conducted no tests, made no examinations, and, as a consequence, recorded no objective findings about her ability to sit, stand, walk, or to focus, concentrate, and persist in a task.

The ALJ's determination that the record does not contain an acceptable diagnosis of fibromyalgia is likewise supported by substantial evidence in the record since there is no diagnosis supported by the requisite number of pain trigger points. "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[22]  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court there said:  "Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  Id.  A patient's subjective complaint "is an essential diagnostic tool" for the treating physician.  Id., quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997).  Moreover, it is relevant to the weight of a treating physician's opinion that he or she have "personally monitored the effectiveness of various therapies and found that they failed to provide any significant improvement . . . ."  Id.  See Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating physician's opinion not conclusory when it was the "culmination of

---

[22] The court there found that the administrative law judge had an "all pervasive misunderstanding of the disease," finding inappropriate that the ALJ criticized the claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist, or psychiatrist."  78 F.3d at 307.

numerous visits [plaintiff] had with her past doctors, and his experience with treating her chronic pain.").

Nonetheless, the ALJ's credibility finding is not supported by substantial evidence in the record.  Plaintiff's two herniated cervical discs, though "small," and the annular tear in the lumbar spine caused by the May 13, 2005, motor vehicle accident standing alone satisfy the pain standard because this is "evidence of an underlying medical condition . . . and . . . the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."  Wilson v. Barnhart, 284 F.3d at 1225.

In addition, there is significant evidence of some other kind malady causing pain. The most recent evidence is from Dr. Lang, who, like Dr. Ortolani, said "[s]he is now disabled as a result of these car accidents and due to the chronic pain."  R. 253. Moreover, Dr. Lang thought that rather than fibromyalgia, "she probably more likely has chronic pain syndrome."  *Id.*  Additionally, Dr. Lang thought that Plaintiff might suffer from bipolar disorder and prescribed Seroquel.  R. 251.  Whether Plaintiff technically suffers from fibromyalgia or chronic pain syndrome is immaterial to the credibility finding as every treating and consulting medical source credited Plaintiff's subjective symptoms, finding that Plaintiff was in a lot of generalized pain.  Dr. Lang examined Plaintiff, finding that she appeared to be in pain, "is moving around continuously; does not want to sit still and complaining of her back, shoulders, arms, and legs generally aching although this is not new."  R. 254.  Dr. Lang found that Plaintiff was "[t]ender all over, tender to touch and tensing of the shoulders, arms, thighs, and lower back."  *Id.* Dr. Deitchman said that Plaintiff "displayed notable pain related behaviors including lying down, shifting positions in her chair, getting up at points to move about, and

closing her eyes in pain."  R. 146.  On his first examination on June 2, 2005, Dr. Ortolani found that Plaintiff had:

> paracervical and paralumbar muscle tenderness and spasms of moderate severity.  She can barely turn her neck from side to side and she cannot extend the back at all.  Straight leg raising bilaterally produces pain in both legs.

R. 209.  Finally, although Dr. Mauro found that Plaintiff's manual muscle strength was normal and he did not detect any paraspinal spasm, Plaintiff "reported diffuse pain with all resistance testing," had "significant pain with straight leg raise testing at 20 degrees bilaterally," and her neck and back were tender to palpation; and his secondary diagnostic impression was fibromyalgia.  R. 141-142.  Indeed, while it is improper to draw conclusions solely from the way in which a claimant conducts herself during a hearing, the transcript of this hearing is consistent with the evidence above.[23]  Plaintiff seems to have had to move frequently during the hearing due to discomfort.

Further, Plaintiff's treating physicians have continuously prescribed strong pain medications. It is reasonable to conclude that the treating physicians would not have prescribed continuous serious pain medication had they not believed that Plaintiff was

---

[23] In the Eleventh Circuit, it is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed.  Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).  The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used.  McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

suffering from pain to the degree she alleged.  While it is possible for pain medications to control chronic pain so that a person retains the residual functional capacity to work, the findings above seem to indicate that despite the medications, Plaintiff still suffers continuous serious pain, as she testified.  The notations that the pain medication controlled Plaintiff's pain to some extent is not inconsistent with her testimony.  As Dr. Lang said, the "best we can hope for is to dampen down the pain, so that it becomes bearable or to have [it] not noticeable anymore, so our main aim here is to get her pain under control and her sleeping under control."  R. 251.

While in another case I would recommend that the court reverse the Commissioner's decision to deny benefits and order that the application be granted, that is not recommended here.  A remand is required for the problems identified above, and a remand would also be useful to permit the Plaintiff to update her medical records and for the Commissioner to obtain evidence from a rheumatologist as to whether Plaintiff has fibromyalgia or a similar disease, and to what extent her generalized pain condition has an effect upon her residual functional capacity, with special attention to her ability to concentrate and maintain appropriate pace in a competitive work environment.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and are not based upon substantial evidence in the record.  The decision of the Commissioner should be reversed and the case be remanded to supplement Plaintiff's medical records, to obtain evidence from a rheumatologist as to whether Plaintiff has fibromyalgia or a  similar disease, and to what extent her condition has an effect upon her residual functional capacity, to re-determine

her residual functional capacity, and to correct the problems identified above with respect to the hypothetical and questions posed to the vocational expert.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be **REMANDED** to supplement and update Plaintiff's medical records, to obtain evidence from a rheumatologist as to whether Plaintiff has fibromyalgia or a similar disease, and to what extent her condition has an effect upon her residual functional capacity, to re-determine her residual functional capacity, and to correct the problems identified above with respect to the questions posed to the vocational expert.

**IN CHAMBERS** at Tallahassee, Florida, on March 26, 2009.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**